1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                               DISTRICT OF NEVADA

10                                       * * *

11   UNITED STATES OF AMERICA,          )
                                        )        Case No. 2:16-cr-00285-APG-NJK
12                  Plaintiff,          )
                                        )        ORDER AND
13   vs.                                )        REPORT &  RECOMMENDATION
                                        )
14   BRANDON LAMAR PRUITT,              )
                                        )        (Docket No. 36)
15                  Defendant.          )
                                        )
     _____)
16

17          This matter was referred to the undersigned Magistrate Judge on Defendant Brandon Lamar

18   Pruitt's motion to suppress.  Docket No. 36.  On August 14, 2017, the Court held an evidentiary

19   hearing on Defendant's motion.  Docket No. 65.  The Court has considered Defendant's motion, the

20   United States' response, Defendant's reply, the evidence adduced at the evidentiary hearing on this

21   matter, and the parties' arguments.  Docket Nos. 36, 42, 44, 65.[1]

22   I.     **BACKGROUND**

23          A.     **Testimony of Detective Chapman**

24          On July 21, 2016, Las Vegas Metropolitan Police Department (LVMPD) Detective Travis

25   Chapman assisted other LVMPD officers in executing a search warrant at 7200 Pirates Cove,

26   Building 24, apartment 2081.  Hearing Tr. (8/14/2017) at 10:13 a.m., 10:22 a.m.  When officers

27   arrived to execute the search warrant, a juvenile female was present inside the residence.  Hearing

28

     _____
          [1] Citations to the recording of the hearing are noted by "Hearing Tr." followed by the relevant
     date and time of the hearing, as no written transcript has been prepared.

Tr. (8/14/2017) at 10:25a.m.  As part of the execution of the warrant, Detective Chapman searched the master bedroom of the residence.  Hearing Tr. (8/14/2017) at 10:13 a.m., 10:24 a.m.  In that master bedroom, Detective Chapman found narcotics and firearms, as well as several pieces of jewelry that had been stolen in a burglary.  Hearing Tr. (8/14/2017) at 10:13 a.m., 10:26 a.m.  He also found a California driver's license in the name of Defendant Brandon Pruitt in the master bedroom.  Hearing Tr. (8/14/2017) at 10:14 a.m., 10:25 a.m.

During the search, Detective Chapman found a journal in the hallway closet.  Hearing Tr. (8/14/2017) at 10:14 a.m., 10:27 a.m., 10:35 a.m.  The journal contained a picture of Defendant, as well an entry in the journal about Defendant taking a female from a different location, as well as text that indicated the female was possibly a prostitute and Defendant was her pimp.  Hearing Tr. (8/14/2017) at 10:14 - 10:15 a.m.  Detective Chapman did not seize the journal at that time, as it was not relevant to why the officers were searching the residence, and the female who owned the journal was not there at that time.  Hearing Tr. (8/14/2017) at 10:15 a.m.  At that point, Detective Chapman did not think the journal had evidentiary value.  Hearing Tr. (8/14/2017) at 10:27 a.m.  When Detective Chapman and the other officers finished executing the search warrant on July 21, 2016, they left the residence.  Hearing Tr. (8/14/2017) at 10:15 a.m.  Defendant was taken into custody as well.  Hearing Tr. (8/14/2017) at 10:23 a.m.

Detective Chapman subsequently listened to jail calls between Defendant and a few females.  Hearing Tr. (8/14/2017) at 10:15 a.m., 10:27 a.m.  The conversations in the calls included discussions related to prostitution, as well as to Defendant directing one of the females to take some jewelry that they had recently acquired to the swap meet to be appraised for sale.  Hearing Tr. (8/14/2017) at 10:15 - 10:16 a.m., 10:28 - 10:31 a.m.  Some of the conversations indicated that one of the females had stolen jewelry on her person at the time of the execution of the search warrant.  Hearing Tr. (8/14/2017) at 10:31 a.m.  Defendant told one of the females that she needed to continue the business and she knows what he needs her to do, which sounded to Detective Chapman like a common pimp/prostitute conversation.  The female was screaming and sounded terrified.  Hearing Tr. (8/14/2017) at 10:29 a.m.  In part of one conversation, Defendant asked what had been seized from the residence.  Hearing Tr. (8/14/2017) at 10:29 a.m.  Detective Chapman believed that the

jewelry discussed was related to the jewelry that law enforcement was looking for when it executed

the search warrant at Defendant's residence on July 21, 2016. Hearing Tr. (8/14/2017) at 10:16 a.m.

Prior to executing the search warrant, Detective Chapman had been given information that, during

a traffic stop of Defendant, a female fled and had not been located. Based on the jail calls, Detective

Chapman believed that one of the females was the one who had fled and was now located at the

residence. Hearing Tr. (8/14/2017) at 10:16 a.m., 10:29 - 10:30 a.m.

After listening to the jail calls, and because of their content, Detective Chapman returned to

the residence on July 22, 2016 to retrieve the stolen property. Hearing Tr. (8/14/2017) at 10:16 a.m.,

10:31 a.m. When he knocked on the door, two females - a white female and a black female - opened

it. Hearing Tr. (8/14/2017) at 10:17 a.m., 10:32 a.m., 10:40 a.m.[2] Both females said that they lived

at the residence. Hearing Tr. (8/14/2017) at 10:32 - 10:33 a.m., 10:45 a.m. When the detectives

started talking about the female that ran from the vehicle stop the night before and the stolen jewelry,

the black female invited them into the residence because she did not want to talk on the patio where

the neighbors might be able to hear the discussion. Hearing Tr. (8/14/2017) at 10:17 a.m., 10:33

a.m., 10:45 a.m., 10:47 a.m. Detective Chapman separated the two females, and spoke with the

white female in the dining room. She started to talk about wanting to get out of prostitution and,

when she indicated that she did not want to speak in front of the black female who was related to

Defendant, which gave the white female concern about retaliation, she and Detective Chapman went

into the master bedroom to talk. Hearing Tr. (8/14/2017) at 10:17 a.m., 10:33 - 10:34 a.m.

The female used a false name to identify herself to Detective Chapman. Hearing Tr.

(8/14/2017) at 10:18 a.m., 10:34 a.m. During the conversation, the female told Detective Chapman

that Defendant was "working her," which the detective explained was a street term for prostitution.

Hearing Tr. (8/14/2017) at 10:34 a.m. Detective Chapman asked the female if she wanted to get out

of prostitution, and she said she did. Hearing Tr. (8/14/2017) at 10:34 a.m. During the conversation

---

[2]In his declaration of arrest for the white female, Detective Chapman wrote that the black female opened the door of the residence, that he asked her if he and his partner could enter, and that she said yes. Hearing Tr. (8/14/2017) at 10:41 a.m. After he was already in the residence, the white female came from the back bedroom. Hearing Tr. (8/14/2017) at 10:41 a.m. Detective Chapman testified that he recalls both females at the doorway. Hearing Tr. (8/14/2017) at 10:40 a.m., 10:44 a.m.

about leaving prostitution, the female was "frantically crying about it and terrified." Hearing Tr. (8/14/2017) at 10:34 a.m.[3] Detective Chapman said that he noticed a journal in the closet the night before and asked if it was hers; she said it was. Hearing Tr. (8/14/2017) at 10:18 a.m., 10:34 a.m. The text of the journal demonstrated that the female was "very involved in prostitution," and that Defendant was most likely her pimp. Hearing Tr. (8/14/2017) at 10:18 a.m. Detective Chapman believed that the journal belonged to this female because of the way that it was decorated, and because the text was in her own words telling her story about her relationship with Defendant. Hearing Tr. (8/14/2017) at 10:18 a.m. Additionally, the journal contained magazine clippings, as well as a picture of the female either on the front or inside of the journal. Hearing Tr. (8/14/2017) at 10:19 a.m., 10:49 a.m. Further, the female acknowledged that the journal was, in fact, her journal and that she had written the journal entries, and she spoke with the detective about the contents of the journal. Hearing Tr. (8/14/2017) at 10:19 a.m., 10:49 a.m. The female told Detective Chapman that she and Defendant were dating. Hearing Tr. (8/14/2017) at 10:35 a.m. The female also told Detective Chapman about some stolen jewelry in the master bedroom that had been missed during the execution of the search warrant the day before, so Detective Chapman seized that jewelry. Hearing Tr. (8/14/2017) at 10:19 a.m.

Detective Chapman asked the female to go to the station with him, and asked if they could take the journal with them. Hearing Tr. (8/14/2017) at 10:20 a.m., 10:34 a.m., 10:35 a.m. The female said they could take the journal as long as she could get it back at some point. Hearing Tr. (8/14/2017) at 10:20 a.m., 10:50 a.m. The female voluntarily handed her journal to Detective Chapman so that they could take it to the station and review its contents. Hearing Tr. (8/14/2017) at 10:37 a.m. The female consented to Detective Chapman taking the journal to the station. Hearing Tr. (8/14/2017) at 10:50 a.m. Therefore, Detective Chapman transported both the female, along with her purse or wallet and the journal, to the Northwest Area Command, where he interviewed her.

---

[3]During this conversation, Detective Chapman identified the female as the person who had fled from the car stop the night before. Hearing Tr. (8/14/2017) at 10:47 - 10:48 a.m.

Hearing Tr. (8/14/2017) at 10:20 a.m., 10:35 a.m., 10:43 a.m.[4]  During the ride to the station, the journal sat between Detective Chapman and the female.  Hearing Tr. (8/14/2017) at 10:37 a.m.  Once they arrived at the station, Detective Chapman carried the journal inside.  Hearing Tr. (8/14/2017) at 10:37 a.m.

At some point while she was at the station, Detective Chapman learned the female's true identity, and that she was a juvenile.  Hearing Tr. (8/14/2017) at 10:20 a.m., 10:37 a.m.  At that point, Detective Chapman read the female her juvenile *Miranda* rights and arrested her for providing false information so that she would not end up back on the street.  Hearing Tr. (8/14/2017) at 10:20 - 10:21 a.m., 10:36 a.m.  The juvenile was then transported, along with her journal and other property, to juvenile hall.  Hearing Tr. (8/14/2017) at 10:21 - 10:22 a.m., 10:38 p.m.  Detective Chapman never obtained a search warrant for the journal, as the owner consented to his taking it.  Hearing Tr. (8/14/2017) at 10:38 a.m., 10:50 a.m.

**B.     Testimony of Detective Morton**

In July 2016, LVMPD Detective Larry Morton was assigned to the Northwest Area Command.  Hearing Tr. (8/14/2017) at 10:52 a.m.  On July 20, 2016, he was assigned to a case regarding suspected burglary and forgery/theft.  Hearing Tr. (8/14/2017) at 10:53 a.m.  As part of his investigation, Detective Morton applied for, and received, a telephonic search warrant for the residence located at 7200 Pirates Cove, Building 24, apartment 2081.  Hearing Tr. (8/14/2017) at 10:53 a.m.; Government Exhibit 1.

The investigation began at a Citibank in Las Vegas, and Detective Morton conducted interviews with various people.  Hearing Tr. (8/14/2017) at 10:53 - 10:54 a.m.  One of the interviews was of Alexis Tyler, who had been arrested at Citibank for attempting to cash a check that had been taken in a burglary earlier that day, and taken to Northwest Area Command, where Detective Morton interviewed her.  Hearing Tr. (8/14/2017) at 10:54 - 10:55 a.m., 11:43 a.m.  Detective Morton audio-recorded this interview, which lasted over one hour.  Hearing Tr. (8/14/2017) at 11:44 a.m.  Detective Morton included information provided to him by Ms. Tyler during this interview in his

---

[4]Before placing the female in his department vehicle, Detective Chapman patted her down for weapons.  Hearing Tr. (8/14/2017) at 10:37 a.m., 10:42 a.m.

search warrant affidavit. Hearing Tr. (8/14/2017) at 10:56 a.m. The affidavit states that Ms. Tyler told Detective Morton that she was given the check by a black male named Q, who drives a white mini Cooper. Hearing Tr. (8/14/2017) at 10:56 a.m. The affidavit further states that the mini Cooper was white with a black stripe, and that bank employees observed the vehicle drop Ms. Tyler and Ronnell Smith off at the bank. Hearing Tr. (8/14/2017) at 10:56 a.m. The affidavit also states that Ms. Tyler "directed officers to where she knew Q to live which was 7200 Pirates Cove building 24 apartment 2081." Hearing Tr. (8/14/2017) at 10:57 a.m., 11:34 a.m.; Docket No. 36-1 at 12.

Ms. Tyler never told Detective Morton the specific address of the residence. Hearing Tr. (8/14/2017) at 10:57 a.m. Rather, she gave officers "turn-by-turn directions" to the residence while looking at a map of the area. Hearing Tr. (8/14/2017) at 10:57 a.m., 11:48 a.m. - 11:51 a.m. Detective Morton pulled up the map of the area on his cell phone based on Ms. Tyler's description of the intersection where the apartment was located. Hearing Tr. (8/14/2017) at 12:09 p.m. Ms. Tyler directed officers to where she believed the mini Cooper would be parked and, from there, gave them information as to how to get to the apartment complex and, further, how to get to the apartment itself once in the complex. Hearing Tr. (8/14/2017) at 10:57 - 10:58 a.m., 12:08 p.m., 12:10 p.m. Ms. Tyler's information was "very specific" - she told officers where to pull into the complex and where the vehicle would be parked on the left side under covered parking; she described the pathway between two buildings leading up the stairs to the apartment, as well as where the apartment was located in the building. Hearing Tr. (8/14/2017) at 10:58 a.m., 12:08 - 12:09 p.m. From his knowledge of the area, Detective Morton knew the intersection Ms. Tyler described, as well as the apartment complex, which is how he pulled the map up on his cell phone. Hearing Tr. (8/14/2017) at 12:10 p.m.

Ms. Tyler did not know the kind of car she had been in, but described it as white and small, box-shaped, with black interior and two doors. Hearing Tr. (8/14/2017) at 11:01 - 11:02 a.m., 11:45 a.m. Bank employees saw the vehicle dropping off Ms. Tyler and Ronnell Smith and described it as a black mini Cooper to officers, which Detective Morton included in his search warrant affidavit. Hearing Tr. (8/14/2017) at 12:11 p.m. - 12:13 p.m. Ms. Tyler said that Q lived in the apartment. Hearing Tr. (8/14/2017) at 11:02 a.m., 11:34 a.m. Ms. Tyler said that jewelry and narcotics were

inside the apartment. Hearing Tr. (8/14/2017) at 11:02 a.m., 12:00 p.m. Ms. Tyler also said that Q
wrote her name on the stolen check and signed it. Hearing Tr. (8/14/2017) at 11:35 a.m.

Detective Morton contacted other officers and gave them the directions Ms. Tyler had given.
These officers were able to locate the white mini Cooper parked in the exact location Ms. Tyler had
described. Hearing Tr. (8/14/2017) at 11:03 a.m., 11:04 a.m., 11:45 a.m., 12:08 p.m. The vehicle
was parked under covered parking, which Detective Morton assumed was reserved for residents of
the complex. Hearing Tr. (8/14/2017) at 11:45 a.m. The covered parking spot was not, however,
marked by apartment number. Hearing Tr. (8/14/2017) at 11:46 a.m. The officers then conducted
surveillance of both the vehicle and the pathway to the apartment described by Ms. Tyler. Hearing
Tr. (8/14/2017) at 11:03 a.m. The officers conducted surveillance on a range of apartments in the
vicinity of the pathway. Hearing Tr. (8/14/2017) at 11:54 a.m. The officers' surveillance
corroborated Ms. Tyler's descriptions of the apartment, the vehicle, and where it was parked, as well
as the proximity to the apartment from where the vehicle was parked and the association between
the apartment and the vehicle. Hearing Tr. (8/14/2017) at 12:10 p.m. - 12:11 p.m.

During their surveillance, the officers observed Defendant Brandon Pruitt exit apartment
2081, the apartment described by Ms. Tyler. Hearing Tr. (8/14/2017) at 11:03 a.m., 11:54 a.m. -
11:55 a.m. When Defendant exited the apartment, he was accompanied by a female. Hearing Tr.
(8/14/2017) at 11:04 a.m. Defendant and the female entered the vehicle and drove it away from the
location. Hearing Tr. (8/14/2017) at 11:05 a.m. Defendant matched the description given by Ms.
Tyler, exited the apartment described by Ms. Tyler, and drove off in the car described by Ms. Tyler,
that was parked in the location described by Ms. Tyler. Hearing Tr. (8/14/2017) at 11:54 a.m. -
11:55 a.m., 11:59 a.m., 12:09 p.m. Officers conducted a stop of the vehicle, and Defendant and the
female both fled on foot. Hearing Tr. (8/14/2017) at 11:05 a.m. Defendant was later apprehended
hiding in the area by officers and a K9 unit, and was arrested. Hearing Tr. (8/14/2017) at 11:05 a.m.

Defendant was transported to Northwest Area Command, where Detective Morton and
Detective Bundy interviewed him. Hearing Tr. (8/14/2017) at 11:06 a.m. Detective Morton
included some of the information given to him by Defendant in his search warrant affidavit. Hearing
Tr. (8/14/2017) at 11:06 a.m. At first, Defendant refused to identify himself at all. Hearing Tr.

(8/14/2017) at 11:41 a.m. He then identified himself as Matisia Hamilton, and also told the detectives that cocaine, and possibly methamphetamine, are being sold out of apartment 2081. Hearing Tr. (8/14/2017) at 11:06 - 11:07 a.m., 11:41 a.m.

Although Defendant was given, and waived, his *Miranda* rights, he was asked questions regarding his identity prior to the rights being given. Hearing Tr. (8/14/2017) at 11:09 - 11:16 a.m.; Government Exhibit 3. The questions asked prior to *Miranda* were "general pre-booking questions." Hearing Tr. (8/14/2017) at 11:17 a.m. The questions are related to information that detectives "need to know" - they need to know the identity of the person to whom they are speaking, and they also need to know the identity of the person they are booking so that all of the appropriate documents have the correct name. Hearing Tr. (8/14/2017) at 11:17 a.m. Therefore, prior to *Miranda*, for approximately seven minutes, detectives asked Defendant for his name, criminal history, military history, place of birth, and tattoos in order to determine that he was telling the truth about his identity. Hearing Tr. (8/14/2017) at 11:17 a.m., 11:43 a.m., 12:05 p.m. Additionally, the detectives informed Defendant that, under Nevada law, lying to a police officer about his identity is a crime. Hearing Tr. (8/14/2017) at 11:18 a.m. Defendant nonetheless maintained that his name was Matisia Hamilton. Hearing Tr. (8/14/2017) at 11:18 a.m., 11:40 a.m.

Detective Morton also asked Defendant more questions concerning his identity post-*Miranda*, because he had looked at the identifiers for the name Matisia Hamilton and was still not completely certain that Defendant had given officers his correct name. Hearing Tr. (8/14/2017) at 12:06 p.m. For example, a tattoo was listed for Matisia Hamilton. Hearing Tr. (8/14/2017) at 12:06 p.m. Defendant explained away Detective Morton's concerns about his identity - he stated that he had had a fake tattoo at the time of his prior arrest. Hearing Tr. (8/14/2017) at 12:06 p.m. Defendant's responses regarding his identity were unusual, but plausible enough that the detectives thought they were on the right track. Hearing Tr. (8/14/2017) at 12:07 p.m.

Prior to *Miranda*, Detectives did not provide any other information to Defendant about the case because they did not know who he was and did not want to give him the opportunity to discuss or talk about or explain away any of the information they had. Hearing Tr. (8/14/2017) at 11:18 a.m. Additionally, detectives did not ask Defendant anything about the facts of the case prior to *Miranda*.

Hearing Tr. (8/14/2017) at 11:18 a.m. Post-*Miranda*, detectives interviewed Defendant about the case. Hearing Tr. (8/14/2017) at 11:19 a.m.

During his interview, Defendant told the detectives that more than one person is selling cocaine, and possibly methamphetamine, out of apartment 2081. Hearing Tr. (8/14/2017) at 11:19 a.m. Detective Morton told Defendant that he had information that Defendant had been inside the apartment. Hearing Tr. (8/14/2017) at 11:20 a.m. Although the number of the apartment was never mentioned, Detective Morton was speaking about apartment 2081. Hearing Tr. (8/14/2017) at 11:20 a.m. Detective Morton had information that Defendant was connected to that apartment, as the surveilling officers saw Defendant "come from" that apartment. Hearing Tr. (8/14/2017) at 11:20 a.m. Detective Morton told Defendant that he knew Defendant had come out of the apartment, gotten into the vehicle, and fled the scene of the traffic stop. Hearing Tr. (8/14/2017) at 11:20 a.m. Defendant said that he was at the apartment that day solely for a drug transaction. Hearing Tr. (8/14/2017) at 11:21 a.m. Defendant said that the people at the apartment wanted to purchase pills from him, but he did not want to engage in that transaction. Hearing Tr. (8/14/2017) at 11:21 a.m. Defendant engaged in a long conversation with the detectives about buying and selling narcotics. Hearing Tr. (8/14/2017) at 11:21 a.m. Defendant said he went to the apartment to purchase cocaine or a crystal substance, which is methamphetamine. Hearing Tr. (8/14/2017) at 11:21 a.m.

During their surveillance of the apartment, officers also saw Quantavious Parker ("Q") walk up to the apartment and knock on the door; when no one answered the door, he walked away from the apartment. Officer then stopped him. Hearing Tr. (8/14/2017) at 11:22 a.m., 11:31 a.m., 11:33 - 11:34 a.m. These actions "confirmed" that Q "was connected to that apartment." Hearing Tr. (8/14/2017) at 11:22 a.m. Officers noted that a strong odor of marijuana emanated from the apartment when they contacted Q, and this information was included in the search warrant affidavit. Hearing Tr. (8/14/2017) at 11:23 - 11:24 a.m. This odor corroborated the statements of both Ms. Tyler and Defendant that narcotics were being sold from the apartment. Hearing Tr. (8/14/2017) at 11:23 a.m. Detective Morton conducted a recorded interview of Q. Hearing Tr. (8/14/2017) at 11:24 a.m. The detective included some of the information Q provided during that interview in his search warrant affidavit. Hearing Tr. (8/14/2017) at 11:24 a.m. The affidavit states that Q stated that

Matisia was selling narcotics out of the apartment. Hearing Tr. (8/14/2017) at 11:24 a.m., 11:39 a.m. During the interview, however, detectives asked Q if he knew Matisia, but mispronounced the name as Matthias; Q said he did not know anyone by that name. Hearing Tr. (8/14/2017) at 11:39 a.m., 12:01 p.m.

Additionally, Q denied living at the apartment, but admitted to living in the apartment complex. Hearing Tr. (8/14/2017) at 11:25 a.m., 11:37 - 11:38 a.m., 12:03 p.m. Officers did not conduct further investigation of the apartment in which Q said that he lived. Hearing Tr. (8/14/2017) at 12:14 p.m. Q said that Brandon and Alexis are the only one who have the keys to the apartment. Hearing Tr. (8/14/2017) at 11:56 a.m., 11:58 a.m. Q told the detective that narcotics are sold from and located inside the apartment. Hearing Tr. (8/14/2017) at 11:27 a.m. Detective Morton did not include the information regarding Q's denial that he lived at the apartment in his affidavit because the information is not relevant to establishing probable cause that narcotics are being sold out of the apartment. Hearing Tr. (8/14/2017) at 11:25 a.m., 11:38 a.m.

Prior to Detective Morton's effort to obtain a search warrant for apartment 2081, Ms. Tyler told him that evidence of crimes and/or contraband were located in the apartment. Hearing Tr. (8/14/2017) at 12:00 p.m. Additionally, Q told Detective Morton that evidence of a crime and/or contraband were located inside apartment 2081. Hearing Tr. (8/14/2017) at 12:00 p.m. Further, Defendant told Detective Morton that evidence of a crime and/or contraband were located inside apartment 2081. Hearing Tr. (8/14/2017) at 12:00 p.m. Ms. Tyler told Detective Morton that Ronnell, Q, the "main guy," and maybe one or two females lived in the apartment. Hearing Tr. (8/14/2017) at 12:00 p.m. Q told Detective Morton that Brandon and Alexis lived in the apartment. Hearing Tr. (8/14/2017) at 11:56 a.m., 11:58 a.m. Defendant told Detective Morton that the only person he knew lived in the apartment was someone named Bob, and that he did not know Q or Ronnell. Hearing Tr. (8/14/2017) at 12:01 p.m.

In his search warrant application, Detective Morton requested, and received, authority to seize items of personal identification or possessory items. Hearing Tr. (8/14/2017) at 11:26 a.m. He did so because those items allow law enforcement to ascertain who lives at the residence and who has dominion and control over the property. Hearing Tr. (8/14/2017) at 11:26 a.m.

Detective Morton did not include information that identifiers for Matisia Hamilton did not match Defendant in his search warrant affidavit. Hearing Tr. (8/14/2017) at 11:41 - 11:43 a.m. If someone lies to Detective Morton about his identity, Detective Morton does not discredit all other information that person gives him. Hearing Tr. (8/14/2017) at 12:07 p.m. Rather, Detective Morton makes attempts to corroborate the other information, which is what happened in the instant case. Hearing Tr. (8/14/2017) at 12:07 p.m. Detective Morton found that the statements of Defendant, Q, Alexis Tyler, and Ronnell Smith were consistent with each other and corroborated each other regarding the possession and sales of narcotics and possession of stolen property in apartment 2081. Hearing Tr. (8/14/2017) at 12:08 p.m.

Detective Morton applied for the telephonic search warrant on July 20, 2016, at 11:06 p.m. Hearing Tr. (8/14/2017) at 11:27 - 11:28 a.m. Prior to applying for the search warrant, no law enforcement officer conducted a protective sweep of the residence. Hearing Tr. (8/14/2017) at 11:31 a.m. While Detective Morton applied for the search warrant, officers froze the premises; during this freeze, no one was allowed in or out of the apartment, including its occupants. Hearing Tr. (8/14/2017) at 11:59 a.m. When he applied for the search warrant, Detective Morton included a nighttime clause in the affidavit. Hearing Tr. (8/14/2017) at 11:28 a.m., 11:30 a.m. He did so because freezing an apartment for an extended period of time would cause a greater intrusion on the residents of the apartment than executing a search warrant during nighttime hours as the residents could not use or access the property. Hearing Tr. (8/14/2017) at 11:28 a.m., 11:59 a.m. Also, his team did not have the personnel or the ability to sit on the apartment overnight. Hearing Tr. (8/14/2017) at 11:28 a.m. Further, there is the possibility that evidence, such as narcotics and fingerprints, could be lost or destroyed, though these concerns would be diminished if law enforcement froze the property Hearing Tr. (8/14/2017) at 11:28 - 11:29 a.m., 11:31 a.m., 11:33 a.m. If Detective Morton had not obtained the nighttime clause, LVMPD would have had to freeze the premises until the morning. Hearing Tr. (8/14/2017) at 11:29 a.m. LVMPD froze the apartment during the period of time it took Detective Morton to obtain the search warrant. Hearing Tr. (8/14/2017) at 11:32 - 11:33 a.m.

The search warrant was executed during nighttime hours on July 20-21, 2016. Hearing Tr.

(8/14/2017) at 11:29 a.m.  During the execution of the search warrant, law enforcement officers recovered stolen property that was later identified by the victim of the stolen check, as well as narcotics and stolen firearms.  Hearing Tr. (8/14/2017) at 11:30 a.m.  Further, officers found luggage containing Defendant's identification with his true name in the first bedroom off the living room. Hearing Tr. (8/14/2017) at 11:26 a.m.  Officer Morton immediately recognized the photograph on the identification as that of Defendant.  Hearing Tr. (8/14/2017) at 11:26 a.m.

### C.    Testimony of Detective Leung

LVMPD Detective Richard Leung has been assigned to the Child Exploitation Task Force, where he investigates children being commercially sex-trafficked, for the past six and one-half years. Hearing Tr. (8/14/2017) at 12:33 p.m.  On July 22, 2016, Detective Leung was contacted regarding a juvenile that Detective Chapman had in custody, whom he believed to have been sex-trafficked. Hearing Tr. (8/14/2017) at 12:34 p.m., 12:39 p.m. - 12:40 p.m.  Detective Chapman told Detective Leung that officers had come across a journal during the execution of a search warrant the prior night, that he believed to be prostitution-related.  Hearing Tr. (8/14/2017) at 12:34 p.m.  Detective Chapman said that officers determined that the owner of the journal was a juvenile and that they believed that Defendant was her pimp.  Hearing Tr. (8/14/2017) at 12:35 p.m.  Detective Chapman said that, the day after the execution of the search warrant, officers returned to the residence due to information they had received from jail calls they listened to.  Hearing Tr. (8/14/2017) at 12:35 p.m.

When officers returned to the residence, Detective Chapman said, he spoke with the owner of the journal, and asked her to accompany him to the Northwest Area Command so that he could interview her and discuss the journal, which was at the apartment.  Hearing Tr. (8/14/2017) at 12:35 p.m., 12:41 p.m.  Detective Chapman said that the owner of the journal had agreed to this request. Hearing Tr. (8/14/2017) at 12:35 p.m.  Detective Chapman told Detective Leung that the owner of the journal had consented to bringing the journal with her to Northwest Area Command.  Hearing Tr. (8/14/2017) at 12:35 p.m.  When Detective Chapman and the owner of the journal left the apartment, she was not under arrest.  Hearing Tr. (8/14/2017) at 12:41 p.m.  After the owner of the journal was found to be a juvenile, she was transported to Clark County Juvenile Hall.  Hearing Tr. (8/14/2017) at 12:36 p.m.

1    Eventually, Detective Leung made contact with the juvenile at Clark County Juvenile Hall.

2    Hearing Tr. (8/14/2017) at 12:36 p.m., 12 :42 p.m.  When a patrol officer transported the juvenile to

3    Juvenile Hall, her journal was transported with her, as were all of her personal belongings.  Hearing

4    Tr. (8/14/2017) at 12:36 p.m.  These items were in a property bag because, by this time, the juvenile

5    had been arrested for giving false information to a police officer.  Hearing Tr. (8/14/2017) at 12:42

6    p.m. Detective Leung spoke with the juvenile about the journal multiple times, and he looked through

7    the journal.  Hearing Tr. (8/14/2017) at 12:36 p.m.  The juvenile told Detective Leung that the journal

8    belonged to her.  Hearing Tr. (8/14/2017) at 12:36 p.m.

9    Eventually, Detective Leung impounded the juvenile's journal.  Hearing Tr. (8/14/2017) at

10   12:36 p.m.  In the property report he completed, Detective Leung wrote that the journal was recovered

11   during a search incident to arrest during execution of the search warrant, which was inaccurate.

12   Hearing Tr. (8/14/2017) at 12:37 p.m., 12:44 p.m.  Detective Leung made a mistake because he was

13   learning so much information at the same time that the details became convoluted.  Hearing Tr.

14   (8/14/2017) at 12:37 p.m., 12:49 p.m.  On his property report, Detective Leung marked all of the

15   juvenile's property - the journal, some debit cards, receipts, and her cell phone - as evidence because

16   he can only mark one box, so he had to choose the most important one.  Since he considered the

17   journal, the credit cards, and receipts evidence of a sex trafficking crime, he chose that box.  Hearing

18   Tr. (8/14/2017) at 12:43 p.m., 12:46 p.m.  One of the debit cards found in the juvenile's possession

19   had Defendant's name on it.  Hearing Tr. (8/14/2017) at 12:49 p.m.

20   Detective Leung was not present during the execution of the search warrant or during the

21   return visit to the apartment the next day.  Hearing Tr. (8/14/2017) at 12:38 p.m., 12:39 p.m., 12:48

22   p.m. Detective Leung was not involved with the initial recovery of the journal and did not pat the

23   juvenile down.  Hearing Tr. (8/14/2017) at 12:40 p.m., 12:42 p.m., 12:44 p.m.  Further, Detective

24   Leung was not involved in any portion of the investigation other than the sex trafficking of the

25   juvenile.  Hearing Tr. (8/14/2017) at 12:48 p.m.  The juvenile was arrested by Detective Chapman

26   for giving false information to a police officer, and the journal was recovered based on a search

27   incident to that arrest.  Hearing Tr. (8/14/2017) at 12:38 p.m. - 12:39 p.m., 12:42 p.m., 12:44 p.m. -

28   12:45 p.m.  Detective Leung recovered the journal from the juvenile's property at Juvenile Hall.

Hearing Tr. (8/14/2017) at 12:55 p.m.  The juvenile never asked for the return of her journal.  Hearing Tr. (8/14/2017) at 12:39 p.m.  Eventually, Detective Leung released the juvenile's cell phone to her so that he could keep in contact with her for future court appearances.  Hearing Tr. (8/14/2017) at 12:49 p.m.

## II.     ANALYSIS

### A.     Credibility of Witnesses

The Court ordered an evidentiary hearing in order to make an accurate determination of what occurred in the instant case and how the facts relate to the applicable caselaw.  "The longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding process are not mere platitudes.   Rather, live testimony is the bedrock of the search for truth in our judicial system." *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012).  "[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe the witnesses' demeanor to best ascertain their veracity - or lack thereof." *Oshodi v. Holder*, 729 F.3d 883, 892 (9th Cir. 2013) (internal citation omitted).  *See also See United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (evidentiary hearing required where defendant demonstrates that a significant disputed factual issue exists); *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility").

During the evidentiary hearing in this matter, the Court had the opportunity to listen to the testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to weigh each witness' credibility.  Having done so, the Court finds that Detective Chapman, Detective Morton, and Detective Leung testified credibly.

### B.     Defendant's Pre-*Miranda* Statement

Defendant submits that all statements obtained from him prior to his Miranda warning should be suppressed.  Docket No. 36 at 5.  After Defendant was arrested, he submits, he was interrogated by Detective Bundy.  *Id*.  Defendant submits that he was not provided his Miranda warnings until seven minutes and twenty seconds into the interrogation.  *Id*.  Defendant further submits that, "[a]lthough there is nothing overtly incriminating in these statements," he "is unsure if/how the

government intends to use them." *Id*. Accordingly, he asks the Court to suppress all statements he made prior to being given his *Miranda* warnings. *Id*.

In response, the United States submits that Defendant was not interrogated prior to being given his *Miranda* warnings. Docket No. 42 at 6-7. Rather, the United States contends, detectives were attempting to determine his identification, and questioning about identification does not constitute interrogation. *Id*. at 7. During this time, detectives questioned Defendant regarding his identity, Defendant denied his true identity, and identified himself as Matisia Hamilton. *Id*. Additionally, Defendant tried to get the detectives to give him details regarding their investigation. The detectives, however, refused to do so because, as Detective Morton testified, they needed to know who they were talking to first. The detectives specifically told Defendant that they needed to confirm his identity before they shared any details about the investigation, or asked him any questions about the investigation. *Id*. The United States submits that the initial portion of the interview related solely to identifying Defendant and not for eliciting incriminating responses. *Id*. As soon as Defendant identified himself, the United States contends, detectives "promptly" administered his *Miranda* rights and began interrogating him. *Id*. Therefore, the United States submits, Defendant's pre-*Miranda* statements should not be suppressed. *Id*. at 7-8.

In reply, Defendant submits that not all of the statements he made prior to Miranda were related to his identity. Docket No. 43 at 3. As an example, Defendant submits that one of the detectives asked Defendant if he was involved in a search warrant in a different case during that portion of the statement. *Id*. Therefore, Defendant asks the Court to suppress all statements obtained from him prior to *Miranda*. *Id*.

Interrogation initiated by law enforcement officers after a suspect "has been taken into custody or otherwise deprived of his freedom of action in any significant way" must be preceded by *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *accord United States v. Wilson*, 666 F.2d 1241, 1246 (9th Cir. 1982). "In order to combat [the pressures inherent in custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights." *United States v. Williams*, 435 F.3d 1148, 1151 (9th Cir. 2006) (quoting *Miranda*, 384 U.S. at 467).

The "touchstone" for *Miranda* warnings is whether the suspect was in custody when interrogated. *United States v. Barnes*, 713 F.3d 1200, 1205 (9th Cir. 2013) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). To determine whether an individual was in custody, the Court must examine the totality of the circumstances. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The test is whether "a reasonable innocent person in such circumstances would conclude after brief questioning [that] he or she would not be free to leave." *United States v. Bassignani*, 575 F.3d 879, 883-84 (9th Cir. 2009) (quoting *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1981)). A *Miranda* warning functions both to reduce the risk that an involuntary or coerced statement will be admitted at trial and to implement the Fifth Amendment's self-incrimination clause. *Id*. at 1151. Thus, if a suspect in custody does not receive an adequate warning effectively apprising him of his rights before he incriminates himself, his statements may not be admitted as evidence against him. *Id*. at 1152. In determining whether a suspect was in custody, "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (*quoting California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

"[T]he term 'interrogation' under *Miranda* refers ... to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Williams*, 842 F.3d 1143, 1146-1147 (9th Cir. 2016) (internal citation omitted). Routine gathering of "background biological information, such as identity, age, and address, usually does not constitute interrogation." *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006). *See also Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (answers to questions regarding defendant's name, address, height, weight, eye color, date of birth, and current age were admissible in the absence of *Miranda* warnings); *United States v. Zapien*, 861 F.3d 971, 974-975 (9th Cir. 2017). Pre-*Miranda* questions about a person's identity "are not unconstitutional even if identification of the person may help lead to the prosecution of that person for a crime." *Id*. at 1133.

In the instant case, Defendant had been arrested before he gave the statement to detectives. Therefore, he was clearly in custody. The Court finds, however, that the pre-*Miranda* statement does

- 16 -

not constitute interrogation. The Court listened to the statement marked as Government's Exhibit 3 from the beginning until Detective Bundy begins the *Miranda* warning, and finds that the questions were clearly designed to identify Defendant and not to elicit incriminating statements from him, including the brief discussion about whether he had been involved in a prior search warrant in a different case. Therefore, the Court finds that Defendant was not subjected to custodial interrogation prior to the time he was advised of his *Miranda* rights.

### C.    *Franks* Hearing

Defendant next submits that Detective Morton made material misrepresentations and omissions in his search warrant affidavit and, therefore, asks the Court to conduct an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) to determine whether the affidavit was sufficient to establish probable cause.

Specifically, Defendant alleges that Detective Morton's statements that Alexis Tyler "directed officers to where she knew Q to live which was 7200 Pirates Cove building 24 apartment 2081," and that "Alexis was also able to identify a white mini cooper that was used to drive her to the bank and it was located under the covered parking of 7200 Pirates Cove" constitute material misrepresentations, as Ms. Tyler gave general directions to the apartment and did not specifically state that a white mini Cooper was used to drive her to the bank. Docket No. 36 at 8-9.

Additionally, Defendant submits that Detective Morton's affidavit contains the misleading statement that "Matisia is selling narcotics from the residence" when, in fact, Q stated he did not know anyone named Matisia. *Id*. at 9. Defendant further submits that Detective Morton omitted Q's statement that he did not live in the apartment, which contradicted Alexis Tyler's statement. *Id*. at 9-10. Finally, Defendant submits that the affidavit contains two misrepresentations related to his own statements. First, the affidavit states that Defendant told detectives that "narcotics are being sold out of the apartment 2081" when, in fat, Defendant told detectives he did not know the apartment number. *Id*. at 10. Second, Defendant alleges that Detective Morton omitted from the affidavit the fact that the detectives questioned whether Defendant was truthful in identifying himself as Matisia Hamilton and therefore failed to disclose information to the judge that "could have undermined the reliability of any information" Defendant provided to the detectives. *Id*.

In response, the United States submits that Defendant has failed to meet his burden under *Franks*. Docket No. 42 at 12. With regard to Ms. Tyler, the United States submits that she identified the apartment complex "and then gave specific directions as to how to get to [the] apartment once inside the complex, as well as where [the] car would be parked." *Id*. Therefore, though she never specifically stated the apartment number, the United States contends, she clearly directed officers to the apartment, allowing them to identify the number of the apartment, and the "challenged statement is not even misrepresentative of what Tyler said and what officers did as a result." *Id*. at 13. The United States further contends that Tyler described the vehicle and provided officers with specific directions as to where it would be parked in the apartment complex. *Id*. The United States therefore submits that no misrepresentation occurred with relation to Ms. Tyler's statements and that, even if they did, Defendant cannot show that they had a material effect on probable cause. *Id*.

The United States next submits that, although Q did not identify Defendant's false alias as the person selling narcotics from the apartment, he did identify Defendant under his true name as such. *Id*. at 14. Further, the United States submits, the purpose of the affidavit was to show that narcotics sales were occurring from the apartment, not which person was selling them. *Id*. Therefore, the United States contends, even if the Court struck the name Matisia from the affidavit, it is clear that Q stated that narcotics were being sold from the apartment, and therefore probable cause exists. *Id*. The United States submits that Q's statement that he did not live in the apartment relates to Q's veracity as opposed to Detective Morton's, which does not constitute an appropriate *Franks* challenge. *Id*. at 15. In any event, the United States submits, the information received was consistent regarding narcotics sales from the apartment; therefore, who resided at the apartment was not relevant for probable cause purposes. *Id*. Finally, in relation to Defendant's statements, the United States submits that Defendant admitted to detectives that he sells drugs out of the apartment officers saw him leaving "from time to time." *Id*. at 16. Defendant also told detectives that other drugs like cocaine were also sold out of that apartment. *Id*. The fact that Defendant was seen walking out of apartment 2081, the United States submits, clearly demonstrates that that was the apartment about which he was speaking, even though he did not specifically state its exact number. *Id*. Regarding Defendant's identity, the United States submits that whether detectives suspected him of giving the

wrong identity or not did not impact the consistent information given about narcotics sales from the apartment or affect probable cause. *Id*. Therefore, the United States contends, this omission was not material. *Id*.

In reply, Defendant submits that significant issues exist concerning each of the statements of Tyler, Q, and Defendant. Docket No. 43 at 6. He contends that Detective Morton "took bits and pieces of information and misrepresented the nature of the information while omitting pertinent facts that would undermine the credibility of each of the individuals he relied upon to support the search warrant for apartment 2081." *Id*. Defendant submits that Ms. Tyler's description was too general to lead detectives to the apartment. *Id*. Further, he contends that officers had reason to doubt her description of the vehicle as a white mini Cooper, as bank employees stated the vehicle was black in color. *Id*. at 7. Defendant submits that Detective Morton led the issuing judge to believe Ms. Tyler identified the exact vehicle and apartment, which is not true. *Id*. Finally, Defendant submits that Q's statement that he did not live in the apartment undermines Ms. Tyler's credibility as well as the entire reason for searching the apartment. *Id*. Defendant submits that the Court can infer reckless disregard for the truth because the affidavit "did not report important factual information that was within the officers' knowledge at the time the affidavit was prepared." *Id*. at 9.

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court addressed at length whether a false statement by a government affiant invalidates a search warrant. *United States v. Hammett*, 236 F.3d 1054, 1058 (9th Cir. 2001) (citation omitted). Under certain circumstances, a defendant is entitled to an evidentiary hearing to afford the defendant an opportunity to attack the veracity of a facially-valid affidavit used to support a search warrant. A defendant can challenge a facially valid affidavit by making a substantial preliminary showing that "(1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information." *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) (*citing United States v. Stanert,* 762 F.2d 775, 780-81 (9th Cir. 1985)).

Before a criminal defendant is entitled to go beneath the search warrant to obtain additional information concerning the police investigation and an informant, he or she is required to make a substantial threshold showing. A defendant's preliminary showing cannot be "merely conclusionary."

*Reeves*, 210 F.3d at 1044. "There must be allegations of deliberate falsehood or reckless disregard for the truth, and these allegations must be accompanied by an offer of proof." *Hammett*, 236 F.3d at 1058 (*quoting Franks*, 438 U.S. at 171). "To justify a hearing, a defendant must make specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and accompany such a claim with a detailed offer of proof." *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008) (citation omitted). See also *Franks*, 438 U.S. at 171 (given the assumption of validity underlying a supporting affidavit, a party moving for a *Franks* hearing must submit "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof"). The movant bears the burden of proof and must make a substantial showing to support both elements. *See United States v. Garcia–Cruz*, 978 F.2d 537, 540 (9th Cir. 1992).

Intentional or reckless omissions may provide grounds for a *Franks* hearing. *United States v. Jawara*, 474 F.3d 565 (9th Cir. 2007)); *see also United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985) ("By reporting less than the total story, an affiant can manipulate the inferences a magistrate [judge] will draw. To allow a magistrate [judge] to be misled in such a manner could denude the probable cause requirement of all real meaning"). Although "[c]lear proof of deliberate or reckless omission is not required," a "[d]efendant 'must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reason for omitting facts in order to prove a deliberate falsehood or reckless disregard." *United States v. Souffront*, 338 F.3d 809, 822-23 (7th Cir. 2003). A defendant must also show that the "affidavit, once corrected and supplemented," would not "provide ... a substantial basis for concluding that probable cause existed." *Stanert*, 762 F.2d at 782. "[T]he omission rule does not require an affiant to provide general information about every possible theory, no matter how unlikely, that would controvert the affiant's good-faith belief that probable cause existed for the search." *Craighead* 539 F.3d at 1081.

The Ninth Circuit has identified five requirements that a defendant must satisfy before he is entitled to a *Franks* hearing:

> (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable

1    cause.

2    *United States v. Perdomo*, 800 F.2d 916, 920 (9th Cir. 1986) (quoting *United States v. DiCesare*, 765

3    F.2d 890, 894-895 (9th Cir. 1985)).

4        In this case, the Court ordered an evidentiary hearing due to the fact that a dispute over the

5    facts existed in the parties' briefing. *See* Docket No. 47. During the evidentiary hearing, the parties

6    were allowed to ask questions regarding potential omissions and misstatements in the affidavit.

7    Docket No. 65. As a result, though the Court finds here that Defendant has not met his burden for

8    a *Franks* hearing, he has already received one.

9        Defendant has alleged specifically which portions of the affidavit he submits contain either

10   omissions or misstatements, which satisfies the first requirement. The Court finds, however, that

11   Defendant fails to make a substantial preliminary showing that the omissions and/or misstatements

12   were deliberately or recklessly made, as per the second requirement. Further, Defendant has not met

13   the third requirement, as he fails to make a detailed offer of proof to accompany his allegations.

14   Additionally, Defendant has not met the fourth requirement regarding Q's statement denying that he

15   lived at the apartment, as he challenges Q's veracity and not that of the affiant. Finally, Defendant has

16   failed to meet the fifth requirement, as he has failed to show that the challenged statements/omissions

17   are necessary to probable cause.

18       In any event, the Court has now heard Detective Morton's testimony regarding all of the

19   statements/omissions. The Court finds that Ms. Tyler gave detailed information regarding the

20   apartment complex and the apartment itself within the complex that, combined with Detective

21   Morton's knowledge of the area, allowed him to send officers for surveillance. The surveillance

22   officers' observations corroborated Ms. Tyler's information. Therefore, the Court finds that the

23   statement in the affidavit that Ms. Tyler "directed" officers to apartment 2081 is not a misstatement.

24   See Docket No. 36-1 at 12. Further, Ms. Tyler described the mini Cooper that Q drove to Detective

25   Morton and also gave detailed information regarding where it would be parked at the apartment

26   complex. The surveilling officers found the vehicle parked where Ms. Tyler said it would be, and

27   further observed Defendant leaving the subject apartment and driving away in the same vehicle. The

28   Court therefore finds that Detective Morton's statement in the affidavit that Ms. Tyler identified the

vehicle and it was located under the covered parking of 7200 Pirates Cove is not a misstatement. Even if the Court were to take that statement out of the affidavit, however, probable cause to search the apartment would not be impacted.

Detective Morton did not include Q's statement that he did not live in the apartment in his affidavit. *See* Docket No. 36-1. The Court does not find that he omitted this statement knowingly or in reckless disregard for the truth, and further finds that this omission is not a material omission. Detective Morton was focused on the probable cause for the apartment itself, and consistent statements had been given to him that narcotics sales were being conducted from the apartment and that stolen property was located in the apartment, no matter who lived there. Further, Defendant argues that, since Q's statement that he did not live in the apartment contradicts Ms. Tyler's statement that he did live in the apartment, it should have been included in the affidavit so that the issuing judge could determine the underlying credibility of the two witnesses. "Allegations that statements reported in the affidavit and made to the affiant are false are not sufficient to satisfy the requirements for a *Franks* hearing unless the defendant contends that the affiant has misrepresented the statements made by another." *Perdomo*, 800 F.2d at 921. *See also United States v. Staves*, 383 F.3d 977, 983 (9th Cir. 2004); *United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983) ("The offer of proof [for a *Franks* hearing] must challenge the veracity of the affiant, not that of his informant"). Here, Defendant has made no claim that Detective Morton inaccurately reported the statements made to him by either witness and, therefore, he has challenged the veracity of Ms. Tyler and Q, not the affiant.

Defendant also submits that Detective Morton made a misstatement when he stated in the affidavit that Q said Matisia sells narcotics out of the apartment, because Q told the detectives that he does not know who Matisia is. At the hearing, Detective Morton testified that he mispronounced the name Matisia as Matthias during his interview with Q. Q stated that he did not know Matthias, but also stated that Brandon was selling narcotics from the apartment. As the United States notes, Q identified Defendant by his true name as someone selling narcotics out of the apartment. More importantly, however, Q told detectives that illegal narcotics were being sold from the apartment, thus providing (particularly when combined with the statements of Defendant and Ms. Tyler that illegal narcotics were being sold out of the apartment) probable cause to believe that fruits of a crime would

be found in the apartment. Although the Court finds that Detective Morton did not make a misstatement, even if the Court removes the name Matisia as the person Q said was selling drugs from the apartment, the Court finds that probable cause still exists.

Finally, Defendant submits that Detective Morton made material misstatements regarding statements he made to detectives. The Court finds that Detective Morton's statement in the affidavit that Defendant told him narcotics were being sold out of apartment 2081, when Defendant never gave the apartment number, was not a misstatement. Defendant, however, was specifically discussing the apartment that surveilling officers saw him leave when he said that illegal narcotics are being sold out of the apartment, and that apartment was apartment 2081. The Court finds that the fact that Defendant did not state the actual number of the apartment does not make Detective Morton's statement a misstatement. During Defendant's interview, detectives repeatedly tried to determine whether he was truthful about his identity. Defendant now states that Detective Morton materially omitted his concerns from the affidavit. Detective Morton testified that, every time he questioned Defendant about his identity, Defendant gave him a plausible response. In any event, Defendant is now trying to use his own misstatements to cause the Court to question Detective Morton's affidavit, which is improper for the purpose of a *Franks* challenge. *See, e.g.*, *Perdomo*, 800 F.2d at 921.

The Court finds that Defendant has failed to demonstrate that Detective Morton made a knowing misrepresentation, or a misrepresentation in reckless disregard for the truth in the affidavit. Even if Defendant could make a preliminary showing, however, the Court finds that Defendant has failed to show materiality - that the inclusion of the omissions and omission of other statements would negate the probable cause in the affidavit.

The probable cause standard for a search warrant is whether, based on common sense considerations, there was "a fair probability that contraband or evidence of a crime [would] be found in a particular place." *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir.1992) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The magistrate judge need not determine "that the evidence is more likely than not to be found where the search takes place.... The magistrate [judge] need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir.1991) (citation and internal quotation marks

1  omitted).  Neither certainty nor a preponderance of the evidence is required.  *United States v. Kelley*,

2  482 F.3d 1047, 1050–51 (9th Cir. 2007), citing *Gates*, 462 U.S. at 246 and *United States v. Gourde*,

3  440 F.3d 1065, 1069 (9th Cir. 2006) *(en banc)*.

4          Probable cause is "a fluid concept turning on the assessment of probabilities and the particular

5  factual context not readily, or even usefully, reduced to a neat set of legal rules," and its existence

6  must be determined by an analysis of the totality of the circumstances surrounding the intrusion.

7  *Gates*, 462 U.S. at 232.  Probable cause does not deal with hard certainties, but with probabilities.

8  *Id*. at 241; *see also Brinegar v. United States*, 338 U.S. 160, 175 (1949) (Probable cause deals with

9  "probabilities" which are not technical, but factual and practical considerations of everyday life on

10 which reasonable and prudent people, not legal technicians act).  As noted above, the Supreme Court

11 defines probable cause to search as "a fair probability that contraband or evidence of a crime will be

12 found in a particular place." *Gates,* 462 U.S. at 238.  *Gates* makes clear that the determination of

13 probable cause is made by examining the "totality of the circumstances." *Id*.  The United States

14 Supreme Court has repeatedly emphasized that the probable cause standard is a "practical,

15 non-technical conception." *Brinegar,* 338 U.S. at 175.

16         The *Gates* decision made it clear that a court's decision regarding probable cause should be

17 given great deference.  The duty of a reviewing court is to insure that the issuing court had a

18 substantial basis for concluding that probable cause existed.  A reviewing court is required to examine

19 all circumstances set forth in the affidavit, and in doubtful cases, to give preference to the validity of

20 the warrant. *United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir.), *cert. denied*, 474 U.S. 847

21 (1985).

22         The Supreme Court has declined to articulate a "neat set of legal rules" for evaluating

23 probable cause, *id*. at 232, and instead has instructed magistrate judges to determine probable cause

24 by considering the "totality-of-the-circumstances," *Gates*, 462 U.S. at 230.  In issuing a search

25 warrant, the magistrate judge simply must determine whether there is a "fair probability" that

26 evidence of a crime will be found. *Id*., 462 U.S. at 238, 246.  In looking at the totality of the

27 circumstances, the Court finds that a fair probability existed that evidence of a crime would be

28 discovered in the location specified in the affidavit. *See Gates*, 462 U.S. at 230-31.

In sum, Defendant has not made a substantial preliminary showing that the affidavit contains material misleading omissions and/or misstatements that, if included or deleted, would have negated probable cause.  Accordingly, the Court finds that a *Franks* hearing is unnecessary, even though Defendant has already essentially been afforded one, and Defendant's request for a *Franks* hearing is denied.  Further, the Court finds that, considering the totality of the circumstances, probable cause existed for the issuance of the search warrant.  Detective Morton had consistent information that crimes had been committed, and that fruits of those crimes would be found in the apartment.  Therefore, his affidavit supported probable cause for the issuance of the search warrant for the apartment.

**D.    Nighttime Search Clause**

Defendant submits that the warrant is invalid because it contains a nighttime search clause and the affidavit does not establish probable cause to justify a nighttime search.  Docket No. 36 at 6-7.  Defendant submits that the justification for the nighttime search clause was because the longer a search "of this type is delayed[,] the greater the chance of physical evidence such as potentially fragile fleeting trace evidence will diminish in value." *Id*. at 7.  Defendant also submits, however, that Detective Morton states in his affidavit that the "[l]ocation to be searched is currently secured by officers and a premise freeze is currently underway." *Id*.  Therefore, Defendant contends that Detective Morton's "speculative assertion" that waiting to execute the search warrant until the next morning would allow evidence to potentially be destroyed "was not an exigent circumstance justifying intrusive nighttime entry" into the apartment. *Id*.  Defendant thus submits that the warrant is invalid and asks the Court to suppress all evidence seized during its execution. *Id*.

In response, the United States submits that the affidavit sufficiently justified the nighttime search clause.  Docket No. 42 at 9.  The United States contends that officers received consistent information that the apartment contained evidence related to a residential burglary committed early that day, as well as various drugs. *Id*.  Further, the United States submits that officers did not have a clear indication of how many people had access to the apartment. *Id*.  Therefore, the risk of destruction of evidence overnight, the United States contends, was high. *Id*.  Further, the United States contends that freezing the premises overnight would intrude more significantly on the residents

of the apartment than the nighttime search. *Id*. The United States further submits that the nighttime search requirement is based on a federal rule, rather than a constitutional mandate. *Id*. at 8. Therefore, even if the Court finds that the affidavit did not sufficiently justify the nighttime search clause, the United States contends that the search itself was constitutional and the evidence recovered during the search should not be suppressed. *Id*. at 10.

In reply, Defendant submits that the United States, in its response, attempts to add facts into the four corners of the affidavit, which is improper. Docket No. 43 at 5. Further, Defendant submits that the nighttime search clause was not justified and that the Ninth Circuit has not adopted the suppression rule of the Sixth Circuit cited by the United States. *Id*.

The search warrant affidavit states

> ... night time service is necessary in this application due to my training and experience indicates that a longer search of this type is delayed the greater the chance of physical evidence such as potentially fragile fleeting trace evidence will diminish in evidentiary value. Location to be searched is currently secured by officers and a premise freeze is currently underway.

Docket No. 36-1 at 14.

Federal Rule of Criminal Procedure 41(e)(2)(A)(ii) states, in relevant part, that a search warrant must command the law enforcement officer to "execute the warrant during the daytime, unless the judge for good cause expressly authorizes execution at another time[.] "'Daytime' means the hours between 6:00 a.m. and 10:00 p.m. according to local time." Fed.R.Crim.P. 41(a)(2)(B). The Ninth Circuit has stated that, unless a clear constitutional violation occurs, failure to comply with Rule 41 "requires suppression of evidence only where, (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *United States v. Stefanson*, 648 F.2d 1231, 1235 (9th Cir. 1981) (internal citation and quotation marks omitted). *See also United States v. Ritter*, 752 F.2d 435, 441 (9th Cir. 1985) ("the settled rule in the Ninth Circuit is that a purely technical violation of Rule 41 does not require the suppression of evidence otherwise legally obtained"). "[A]lthough the procedural steps enumerated in Rule 41(d) are important and should not be disregarded, they are ministerial and '[a]bsent a showing of prejudice, irregularities in these procedures do not void an otherwise valid search.'" *Frisby v. United States*,

79 F.3d 29, 32 (6th Cir. 1996) (quoting *United States v. McKenzie*, 446 F.2d 949, 954 (6th Cir.1971)).

The Court rejects Defendant's argument that a nighttime clause can be approved only for exigent circumstances, as the plain language of the rule states that the issuing judge must find that good cause exists for the clause. Fed.R.Crim.P. 41(e)(2)(A)(ii). Additionally, the case that Defendant cites for that proposition cites the rule as requiring reasonable cause for a nighttime clause and states that the rule "has been interpreted to require both specific authorization for an intrusive nighttime search, and that sufficient facts in the affidavit must support" the magistrate judge's authorization." *Stefanson*, 648 F.2d at 1237. Further, the Court finds that Detective Morton's statements in the affidavit regarding the potential for destruction of this type of evidence constitutes good cause for the issuance of a nighttime search clause.

In any event, even if the Court found that good cause did not exist for the issuance of the nighttime clause, the remedy is not suppression. The Court has already found that probable cause exists for the issuance of the search warrant, thus the search was valid. Further, Defendant has not even attempted to demonstrate any sort of prejudice, much less the type required by the caselaw, resulting from the nighttime clause and the nighttime search. Therefore, exclusion of the evidence is not appropriate. *See Stefanson,* 648 F.2d at 1235; *United States v. Searp*, 586 F.2d 1117, 1125 (6th Cir. 1978).

### E.    Detective Chapman's Return to Apartment on July 22, 2016

Defendant submits that Detective Chapman searched the apartment a second time on July 22, 2016, and that the search was unconstitutional. Docket No. 36 at 11-12. Therefore, Defendant asks the Court to suppress the journal and two debit cards that he submits were seized during the second search. *Id*.

In response, the United States submits that officers returned to the apartment on July 22, 2016, after listening to recorded jail calls involving Defendant. Docket No. 42 at 5. At that time, the United States submits, they came into contact with the juvenile, identified her as the person in the vehicle who had fled with Defendant, and asked her to accompany them to Northwest Area Command. *Id*. at 18. The United States submits that the juvenile agreed, and provided a false identity. *Id*. When officers then arrested the juvenile, the United States submits, they recovered her journal and debit

cards in a search incident to her arrest. *Id*. The United States submits that these actions were constitutionally proper and, in any event, Defendant has no standing to challenge the seizure of the items from the juvenile. *Id*. at 18-20.

In reply, Defendant does not address the standing issue. Docket No. 43 at 9-10. Instead, he submits that the United States' response provides "internally inconsistent facts and facts inconsistent with the official reports as to the second search of apartment 2081 and the seizure [of] the journal and other items." *Id*. at 9. Defendant therefore requests an evidentiary hearing. *Id*. at 10.

At the evidentiary hearing, Detective Chapman testified that he returned to the apartment on July 22, 2016, after listening to Defendant's jail calls and determining that officers had missed evidence during the execution of the search warrant. When he arrived, he spoke with the juvenile and a black female. He and his partner were invited into the residence so the neighbors would not hear the discussion. The juvenile (whom he did not know was a juvenile at the time) spoke with Detective Chapman consensually, admitted that the journal was hers, said she wanted to get out of prostitution, and agreed to accompany Detective Chapman to Northwest Area Command. The juvenile also agreed to bring her journal. It was not until after she arrived at Northwest Area Command and after she spoke with Detective Chapman there that he learned she was a juvenile and she was arrested for providing a false identity. The juvenile and her property were transported to Juvenile Hall. Her journal and the debit cards - which were in her property - were seized incident to that arrest. The testimony clearly demonstrated that law enforcement did not conduct a second search of the apartment on July 22, 2016, or any other day.

Since the Fourth Amendment protects people not places, the "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Olson*, 495 U.S. 91, 95 (1990) (citing *Katz v. United States*, 389 U.S. 347 (1967). In order to have "standing" or "capacity" to contest the legality of a search or seizure, a defendant must "demonstrate that [he has] a legitimate expectation of privacy in the items seized or the area searched." *United States v. Parks*, 285 F.3d 1133, 1141 (9th Cir. 2002) (quoting *United States v. Sarkisian*, 197 F.3d 966, 986 (9th Cir. 1999). "A defendant makes this demonstration by establishing a subjective expectation of privacy

in the area searched, that is, one that society would recognize as objectively reasonable." *Parks*, 285 F.3d at 1141 (internal citations omitted). The defendant, if he has standing, then bears the burden of establishing, under the totality of the circumstances, that "the search or seizure violated his legitimate expectation of privacy in a particular place." *United States v. Davis*, 932 F.2d 752, 756 (9th Cir. 1991) (*citing Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)). *See also United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993).

Here, Defendant has failed to demonstrate that he has standing to challenge the seizure of the items seized from the juvenile. The journal clearly belonged to her, and Defendant has failed to demonstrate he has a reasonable expectation of privacy in it. The juvenile consensually took the journal with her to Northwest Area Command. It was then seized from her incident to arrest. *See New York v. Belton*, 453 U.S. 454, 461 (1981). Further, the debit cards that were seized from the juvenile were either on the juvenile's person or in her purse or wallet that she took with her to Northwest Area Command before they were seized incident to arrest. Defendant has failed to demonstrate that he has a reasonable expectation of privacy in the juvenile's purse, wallet, or person. Accordingly, the Court finds that Defendant does not have standing to challenge the seizure of these items.

## ORDER

Based on the foregoing and good cause appearing therefore,

IT IS HEREBY ORDERED that Defendant's request for a *Franks* hearing is **DENIED**.

## RECOMMENDATION

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendant's Motion to Suppress, Docket No. 36, be **DENIED**.[5]

. . . .

. . . .

. . . .

---

[5]In his motion, Defendant also challenged the seizure of certain items in California. Docket No. 36 at 12-13. At the evidentiary hearing, however, the United States represented that it would not use any of those items at trial. Hearing Tr. (8/14/2017) at 10:07 a.m. - 10:08 a.m. Accordingly, the Court recommends that this portion of the motion be **DENIED** as moot.

**NOTICE**

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days of service of this document.** The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This Circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 25th day of September, 2017.


_____
NANCY J. KOPPE
United States Magistrate Judge